GENERAL MOTORS CORPORATION, and CHAPMAN MESA AUTO CENTER, Petitioners, v. THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, in and for THE COUNTY OF CLARK, and THE HONORABLE MICHELLE LEAVITT, District Judge, Respondents, and HEATHER SIMMONS, Real Party in Interest.

No. 44506

May 11, 2006                                      134 P.3d 111

---

*Law Offices of Greg W. Marsh, Chtd.*, and *Greg W. Marsh*, Las Vegas; *Bowman and Brooke LLP* and *Curtis J. Busby*, Phoenix, Arizona, for Petitioner General Motors Corporation.

*Lincoln, Gustafson & Cercos* and *Thomas J. Lincoln* and *Loren S. Young*, Las Vegas, for Petitioner Chapman Mesa Auto Center.

*Mainor Eglet Cottle, LLP*, and *Robert W. Cottle* and *Jennifer V. Willis*, Las Vegas, for Real Party in Interest.

## OPINION

By the Court, HARDESTY, J.:

In this original writ petition, we clarify Nevada's choice-of-law jurisprudence in tort actions. We conclude that the most significant relationship test, as provided in the Restatement (Second) of Conflict of Laws section 145, should govern the choice-of-law analysis in tort actions unless a more specific section of the Second Restatement applies to the particular tort claim. Consequently, we no longer adhere to the choice-of-law analysis previously set forth in *Motenko v. MGM Dist., Inc.*[1]

### FACTS

In April 2002, real party in interest Heather Simmons was driving her 1996 Chevrolet Metro on Interstate 15 in southern Nevada. Jerry Freeland was driving his truck a short distance ahead of Simmons. Freeland's truck struck an object on the road that punctured his fuel tank and caused the tank to spill diesel fuel. When Simmons' vehicle came into contact with the diesel fuel, she lost control and her vehicle overturned. As a result of the accident, Simmons was rendered a quadriplegic.

Simmons is an Arizona resident. Except for the accident and spending several weeks in Nevada for medical treatment, Simmons has no contact with Nevada. After the accident, Simmons

---

[1] 112 Nev. 1038, 1039, 921 P.2d 933, 934 (1996) (plurality opinion).

brought suit against several defendants, including petitioners General Motors Corporation (GM) and Chapman Mesa Auto Center (Chapman Auto). The complaint alleges that Simmons' injuries were caused by, among other things, the failure of her vehicle's roof assembly. Simmons asserts causes of action against GM and Chapman Auto for negligence, breach of implied warranty, strict liability, negligent failure to warn, and negligent infliction of emotional distress.

GM is a Delaware corporation with its principal office located in Michigan. GM manufactured the 1996 Chevrolet Metro that Simmons was driving when the accident occurred. Chapman Auto is the independent auto dealer located in Arizona that sold the Chevrolet Metro to Simmons. Chapman Auto is not a GM dealer, nor is it affiliated with GM in any way.

GM and Chapman Auto sought dismissal of the case for forum non conveniens or, in the alternative, to have the district court apply Arizona law. The district court denied the motion to dismiss and determined that Nevada law should apply. As a result, GM filed this petition for a writ of mandamus, challenging the district court's order and seeking to compel the district court to dismiss the case for forum non conveniens or, in the alternative, to apply Arizona law. Chapman Auto joins in this petition.

## DISCUSSION

The decision to entertain a petition for a writ of mandamus lies within this court's discretion.[2] "A writ of mandamus is available to compel the performance of an act that the law requires as a duty resulting from an office, trust or station, *see* NRS 34.160, or to control an arbitrary or capricious exercise of discretion."[3]

A writ of mandamus is an extraordinary remedy.[4] Consequently, we will only exercise our discretion to entertain a mandamus petition when there is no "plain, speedy and adequate remedy in the ordinary course of law"[5] or "there are either urgent circumstances or important legal issues that need clarification in order to promote judicial economy and administration."[6] Because this case presents important choice-of-law issues that need clarification in

---

[2]*Hickey v. District Court*, 105 Nev. 729, 731, 782 P.2d 1336, 1338 (1989).

[3]*DR Partners v. Bd. of County Comm'rs*, 116 Nev. 616, 620, 6 P.3d 465, 468 (2000).

[4]*State, Div. Child & Fam. Servs. v. Dist. Ct.*, 120 Nev. 445, 449, 92 P.3d 1239, 1242 (2004).

[5]NRS 34.170.

[6]*Cheung v. Dist. Ct.*, 121 Nev. 867, 869, 124 P.3d 550, 552 (2005).

order to promote judicial economy and administration, we exercise our discretion to entertain that part of the writ petition challenging the denial of GM's and Chapman Auto's motion to apply Arizona law.[7]

Since this court's 1996 decision in *Motenko*, Nevada has followed the "overwhelming interest" test for resolving choice-of-law issues in tort actions. The "overwhelming interest" test can best be described as a hybrid of principles contained in the First and Second Restatements of Conflict of Laws. While this "overwhelming interest" test was intended to create a seemingly bright-line approach to resolving choice-of-law issues, it did not deviate from prior tests in a way that furthered the elusive goals of uniformity and predictability in complex, multiparty tort actions, and it fails to take advantage of the ongoing legal scrutiny by other courts and commentators given to the Second Restatement. Therefore, we conclude that our choice-of-law jurisprudence in tort actions warrants review.

### Before Motenko, Nevada followed the vested rights approach

Historically, Nevada followed the First Restatement's vested rights approach when confronted with choice-of-law issues in tort actions.[8] This approach required the court to apply the "substantive law of the forum in which the injury occurred."[9] Although the application of the vested rights approach proved predictable, this court later expressed concern with the test in *Motenko*.[10] In that case, this court abandoned the vested rights approach because that test blindly applied the substantive law of the forum where the injury occurred and produced "unjustifiably harsh results."[11]

### The current state of the law under Motenko

In *Motenko*, the plaintiff and his mother were Massachusetts residents.[12] While visiting Las Vegas, the mother fell and injured herself in a hotel.[13] The plaintiff then filed a claim for loss of

---

[7]We deny that part of the petition challenging the district court's refusal to dismiss for forum non conveniens. *Smith v. District Court*, 113 Nev. 1343, 1344-45, 950 P.2d 280, 281 (1997) (concluding that this court will not exercise its discretion to consider writ petitions that challenge district court orders denying motions to dismiss, except when the court is clearly compelled to dismiss the action under a rule or statute or when an important issue of law requires clarification).

[8]*Motenko*, 112 Nev. at 1039, 921 P.2d at 934 (plurality opinion).

[9]*Id.* at 1039-40, 921 P.2d at 934.

[10]*Id.* at 1040, 921 P.2d at 934.

[11]*Id.*

[12]*Id.* at 1039, 921 P.2d at 934.

[13]*Id.*

parental consortium in a Nevada district court.[14] The district court applied the vested rights approach and determined that Nevada law applied because the injury occurred in Nevada.[15] This court agreed with the district court's determination that Nevada law applied but did so after creating and applying the ''overwhelming interest'' test.[16]

Although a majority opinion was not reached, the *Motenko* court created the new ''overwhelming interest'' test, which retained a key feature of the vested rights approach and borrowed principles from the Second Restatement's ''most significant relationship'' test.[17] The *Motenko* test requires the trial court to apply the substantive law of the forum in tort cases unless ''another state has an overwhelming interest.''[18] Another state has an overwhelming interest if two or more of the *Motenko* factors are met.[19] This approach reduces the conflict-of-law analysis in tort actions to a quantitative comparison of contacts, without any regard to a qualitative comparison of true conflicts-of-law between states.

### *The Motenko test is a hybrid of the vested rights approach and the most significant relationship test*

Both the vested rights approach and the *Motenko* test start from the premise that the law of the forum governs the choice-of-law analysis in tort cases.[20] Thus, both approaches emphasize a predictable and identifiable starting point that helps to further uniformity and predictability.

The *Motenko* test also borrowed and then modified some, but not all, of the Second Restatement's most significant relationship test for torts.[21] The Second Restatement's most significant relationship test for torts is comprised of two sections. First, section 145(1) states that the rights and liabilities of the parties in tort

---

[14]*Id.*

[15]*Id.*

[16]*Id.* at 1041-42, 921 P.2d at 935-36.

[17]*See generally* 112 Nev. 1038, 921 P.2d 933. The five-justice court came to three differing conclusions. First, two of the justices affirmed the district court's order but did so under a modified version of the most significant relationship test. This modified version is the ''overwhelming interest'' test. Second, the concurring justice agreed to affirm the district court's order but argued that the court should do so under the vested rights approach. Third, the two dissenting justices recommended that the court adopt the most significant relationship test in the Second Restatement without modification.

[18]*Id.* at 1041, 921 P.2d at 935.

[19]*Id.* at 1041-42, 921 P.2d at 935. These factors were borrowed, with some modification, from the factors set forth in section 145(2) of the Second Restatement.

[20]*Id.*

[21]*Id.* at 1041-42, 921 P.2d at 935.

actions are determined by the local law of the state that "has the most significant relationship to the occurrence and the parties under the principles stated in § 6." Second, section 145(2) lists four contacts to be considered when applying the section 6 principles.[22]

Despite the clearly stated framework in section 145(1), the *Motenko* test ignores the qualitative principles in section 6, but utilizes the four quantitative contacts in section 145(2).[23] The Second Restatement's four quantitative contacts in section 145(2) were designed to play a supporting role to the primary qualitative principles of section 6.[24] Thus, the *Motenko* test effectively reversed the clearly stated order of priority between section 6 and section 145(2) by making the section 145(2) contacts the primary inquiry. The test also ignored the application of other Restatement sections in choice-of-law determinations designed specifically for a particular tort claim. Thus, *Motenko* created a new, independent test that lacks the historical evaluation, and cannot benefit from ongoing legal scrutiny, to be realized from the First and Second Restatements.

### The Motenko test fails to further certainty, predictability, and uniformity

The stated purpose of the *Motenko* test was to meet "the goal of a higher degree of certainty, predictability and uniformity of result."[25] However, as this court's decision in *Northwest Pipe Co. v. District Court*[26] demonstrates, the application of the *Motenko* test to multiparty tort actions hinders, rather than promotes, these goals.

In *Northwest Pipe*, the defendant, an Oregon corporation, was sued for wrongful death in Nevada by family members of individ-

---

[22]Restatement (Second) of Conflict of Laws § 145(2) states as follows:

> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered.

[23]*Motenko*, 112 Nev. at 1041-42, 921 P.2d at 935 (plurality opinion).

[24]Restatement (Second) of Conflict of Laws § 145 (1971) (stating that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties *under the principles stated in § 6*" (emphasis added)).

[25]112 Nev. at 1042, 921 P.2d at 935 (plurality opinion).

[26]118 Nev. 133, 42 P.3d 244 (2002).

uals who were killed in a California car accident. Two of the decedents were Nevada residents and four of the decedents were California residents. Nine of the eleven plaintiffs were Nevada residents with the remaining two residing in California.[27]

The plurality and concurrence applied the *Motenko* overwhelming interest test and produced an outcome in which the Nevada plaintiffs' claims proceeded under Nevada law and the California plaintiffs' claims against the same defendant proceeded under California law.[28] Instead of qualitatively analyzing the contacts that each cause of action and party had with the competing states, the court simply counted the number of *Motenko* contacts each plaintiff had with California.[29] While this approach may seem simplistic enough to produce uniform and predictable results, it took a plurality and a concurrence, and a dissent to determine which state's law applied to each cause of action.

As demonstrated in *Northwest Pipe*, the *Motenko* test does not deviate from the vested rights approach in a way that furthers the goals of uniformity and predictability in complex, multiparty tort actions. Limiting an inquiry in a difficult area of law to simply counting contacts between the competing states and the parties ignores an essential part of the Second Restatement's most significant relationship test—which state has the most significant relationship to the tort and the parties? This question can be answered most effectively through the qualitative analysis framework that the most significant relationship test provides.

*The Second Restatement's most significant relationship test now governs tort actions in Nevada*

We take this opportunity to clarify Nevada's choice-of-law jurisprudence and hold that the Second Restatement's most significant relationship test governs choice-of-law issues in tort actions unless another, more specific section of the Second Restatement applies to the particular tort. Consequently, we overrule *Motenko*. While we are cognizant that choice-of-law analyses may, at times, lead to subjective results, the best approach to keeping those results uniform is to apply the law of the state that has the most significant relationship to the occurrence and the parties.[30]

---

[27]*Id.* at 134-35, 42 P.3d at 245 (plurality opinion).

[28]*Id.* at 135-36, 42 P.3d at 245-46; *id.* at 136, 42 P.3d at 246 (MAUPIN, C. J., concurring and dissenting); *id.* at 140, 42 P.3d at 248-49 (AGOSTI, J., dissenting) (applying Second Restatement approach).

[29]*Id.* at 135-36, 42 P.3d at 245-46 (plurality opinion).

[30]*Id.* at 139, 42 P.3d at 248 (AGOSTI, J., dissenting) (stating that " '[i]n a rapidly developing area, such as choice of law, it is often more important that

The Second Restatement's most significant relationship test begins with a general principle, contained in section 145: the rights and liabilities of parties with respect to an issue in tort are governed by the local law of the state that, "with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." Section 6 identifies the following principles:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

These principles are not intended to be exclusive and no one principle is weighed more heavily than another.[31]

Importantly, section 145 is a general statement and will not apply to all tort actions. As the dissent in *Northwest Pipe* noted, the Second Restatement has developed other sections that specifically apply to certain torts.[32] Thus, the Second Restatement is designed to provide a particular framework depending on the nature of the tort.

*Section 146 of the Second Restatement governs personal injury claims*

The nature of the current claim is one for personal injury. Section 146 of the Second Restatement provides a particularized framework for analyzing choice-of-law issues in personal injury cases. Section 146 states that the rights and liabilities of the parties are governed by the "local law of the state where the injury occurred" unless "some other state has a more significant relationship" to the occurrence under the principles stated in section 6.

---

good rules be developed than that predictability and uniformity of result should be assured through continued adherence to existing rules' " (quoting Restatement (Second) Conflict of Laws § 6 cmt. i (1971))).

[31]Restatement (Second) of Conflict of Laws § 6 cmt. c (1971).

[32]118 Nev. at 138, 42 P.3d at 247 (AGOSTI, J., dissenting); *see also* Restatement (Second) of Conflict of Laws § 145 cmt. a (1971).

The general rule in section 146 requires the court to apply the law of the state where the injury took place. We conclude that in order for the analysis to move past this general rule and into the section 6 principles, a party must present some evidence of a relationship between the nonforum state, the occurrence giving rise to the claims for relief, and the parties. If no evidence is presented, then the general rule of section 146 governs. However, if a party does present evidence of a relationship between the nonforum state, the occurrence giving rise to the claims for relief, and the parties, then the analysis moves to an evaluation of that evidence under the section 6 principles to determine which state has a more significant relationship to the occurrence and the parties.

The section 6 factors inject flexibility into the choice-of-law analysis. Unlike the vested rights approach and the quantitative focus of the *Motenko* approach, an analysis of the section 6 factors considers the ''content of and the policies behind the [forum and nonforum state's] competing internal laws.''[33] This is the crux on which an informed decision rests its reasoning. The *Motenko* dissent recognized this principle, stating that ''[a] qualitative evaluation under the most significant relationship doctrine promotes consideration of differing state policies and interests underlying the particular issue as factors for making the choice-of-law decision.''[34]

*Nevada law applies to Simmons' causes of action against GM*

GM has failed to present any evidence demonstrating that Arizona has a relationship to the occurrence giving rise to Simmons' claims for relief against GM. The car accident occurred in Nevada, and Nevada is the place of the injury. Additionally, GM is a Delaware corporation with its principal office located in Michigan. GM manufactured the 1996 Chevrolet Metro outside Arizona's borders. While a GM car was sold in Arizona to an Arizona resident, Chapman Auto, which is located in Arizona, is not a dealer or in any other way affiliated with GM.

Because Simmons' claims for relief against GM are centered in Nevada where the accident occurred and Michigan where the car was manufactured, and GM has no relationship with Arizona, GM has failed to present any evidence to suggest that the general rule under section 146 should not apply. Thus, Nevada law applies to

---

[33]William M. Richman & William L. Reynolds, *Understanding Conflict of Laws* § 68, at 200 (3d ed. 2002) (stating that the vested rights ''rules are almost entirely (and deliberately) blind to the content of and the policies behind the competing internal laws'' of each state).

[34]112 Nev. at 1048, 921 P.2d at 939 (STEFFEN, C. J., dissenting).

Simmons' claims against GM because Nevada is the place where the injury occurred.

*Arizona law applies to Simmons' causes of action against Chapman Auto*

Conversely, Chapman Auto has presented evidence demonstrating that Arizona has some relationship to the occurrence giving rise to Simmons' claims against Chapman Auto. Chapman Auto is an independent auto dealer located in Arizona and Simmons is an Arizona resident. Chapman Auto sold the Chevrolet Metro to Simmons in Arizona. Simmons is suing Chapman Auto for injuries resulting from the failure of a roof assembly in a vehicle sold in Arizona. If Chapman Auto is found liable, the occurrence giving rise to liability will have occurred in Arizona.

Thus, the inquiry moves beyond the general rule in section 146 and into an analysis under the section 6 principles to determine whether Arizona or Nevada has a more significant relationship to Simmons, Chapman Auto, and the sale of the vehicle.[35] Applying the section 6 principles, Arizona has a more significant relationship to Chapman Auto and Simmons than Nevada.

### *Section 6(2)(c)*

Section 6(2)(c) states that "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue" should be considered. Unlike Nevada, Arizona has made a policy choice to allow comparative fault defenses to strict liability claims where product misuse is asserted as a defense.[36] Here, there is an allegation that Simmons was driving in excess of the speed limit. If this allegation is proven true, then Arizona has an interest in seeing that its car dealers who operate solely in Arizona receive some protection in strict liability claims.

Further, Arizona's comparative fault defense to tort actions differs from Nevada's.[37] Arizona permits recovery by a plaintiff who is found by a jury to be greater than 50% comparatively at fault, where Nevada does not.[38] In such a case, Arizona only reduces the

---

[35] Section 6(2)(a), (b), and (e) have been considered and have no application to these particular facts.

[36] *Compare Jimenez v. Sears, Roebuck and Co.*, 904 P.2d 861 (Ariz. 1995), *with Jeep Corporation v. Murray*, 101 Nev. 640, 645, 708 P.2d 297, 301 (1985), *and Young's Machine Co. v. Long*, 100 Nev. 692, 692 P.2d 24 (1984).

[37] *Compare* Ariz. Rev. Stat. § 12-2505, *with* NRS 41.141(1).

[38] *See, e.g., Englert v. Canondelet Health Network*, 13 P.3d 763 (Ariz. Ct. App. 2000); NRS 41.141(1) & (2).

recovery by the percentage of comparative fault. Therefore, Arizona has made a policy decision to provide some compensation to plaintiffs regardless of their percentage of comparative fault.

In contrast, Nevada has made policy decisions to allow plaintiffs in strict liability actions to recover the full amount of their injuries regardless of fault but to prevent recovery by plaintiffs on other tort theories if their comparative fault exceeds 50%. Further, Nevada has an interest in protecting tourists who travel its roads. While these policies are indeed important, they carry less weight when they are being applied to an individual with little contact with Nevada who is seeking damages from a resident of the nonforum state for claims that arose out of that state. Thus, on balance, Arizona's interest in having its law applied to the causes of action that an Arizona resident plaintiff raised against an Arizona car dealer outweighs Nevada's interest in applying its own law.

### Section 6(2)(d) and (f)

Section 6(2)(d) states that another factor relevant to a choice-of-law analysis is "the protection of justified expectations." As previously stated, the relationship between Simmons and Chapman Auto is centered in Arizona. When Simmons purchased the car from Chapman Auto, the parties were justified in expecting that the relationship would be governed by Arizona law. Both parties were domiciled in Arizona and the transaction occurred in Arizona. Moreover, protection of this justified expectation furthers the section 6(2)(f) considerations of "certainty, predictability and uniformity of result." Thus, the protection of both parties' justified expectations, along with considerations of certainty, predictability, and uniformity of results, weigh in favor of applying Arizona law.[39]

### Section 6(2)(g)

Lastly, section 6(2)(g) recommends that the courts consider the "ease in the determination and application of the law to be applied." The analysis so far produces an outcome resulting in two separate state laws being applied to a single trial. But in this case,

---

[39]We note that there appears to be a difference in the duty imposed under Arizona law from the duty imposed under Nevada law on the failure to inspect and warn claim. *Compare Witt Ice & Gas Co. v. Bedway*, 231 P.2d 952, 954 (Ariz. 1951) (stating that " '[a]n imperative social duty requires a vendor of a mechanical device to take at least such easily available precautions as are reasonably likely to prevent serious injury to those who by using such a device may be exposed to dangers arising from its defective construction' " (quoting *Ebbert v. Philadelphia Electric Co.*, 198 A. 323, 327 (Pa. 1938))), *with Long v. Flanigan Warehouse Co.*, 79 Nev. 241, 249, 382 P.2d 399, 404 (1963) (stating that a retailer had no duty to inspect or test for a claimed latent defect after the retailer had received the product and inspected it for transit damage).

both states' laws can be accommodated by jury instructions that explain the law applicable to each defendant with respect to Simmons' claims and any potential comparative fault defenses to those claims. Additionally, the district court can utilize special verdict forms to guide the jury in making its determination. Thus, this consideration does not counsel against instructing the jury on two separate state laws.

We conclude, therefore, that Arizona law applies to the causes of action alleged against Chapman Auto because Arizona has a more significant relationship to the claims for relief, Simmons, and Chapman Auto than Nevada.[40]

## CONCLUSION

We now hold that in Nevada, section 145 of the Second Restatement governs choice-of-law issues in tort actions unless the Second Restatement contains a section that specifically addresses a particular tort. Because section 146 governs choice-of-law issues in personal injury claims, we apply the most significant relationship test set forth in section 146 to this case.

Applying section 146, we deny the petition as to GM because, as a legal matter, the car accident and GM have no relationship with Arizona. Consequently, Nevada law applies to Simmons' claims for relief asserted against GM. However, we grant the petition as to Chapman Auto because Arizona has a more significant relationship to Simmons, Chapman Auto, and the sale of the vehicle. Consequently, Arizona law applies to Simmons' claims for relief asserted against Chapman Auto. We deny the petition with respect to the district court's refusal to dismiss the underlying action on forum non conveniens grounds. Accordingly, we direct the clerk of this court to issue a writ of mandamus directing the district court to apply Arizona law to Simmons' claims for relief against Chapman Auto.

ROSE, C. J., BECKER, GIBBONS, DOUGLAS and PARRAGUIRRE, JJ., concur.

MAUPIN, J., concurring in part and dissenting in part:

I agree with the adoption of the Second Restatement as a reasonable construct for resolving conflict of law disputes. I would, however, apply Nevada law to both defendants.

---

[40]Restatement (Second) of Conflict of Laws § 146 cmt. c (1971) (stating that "[t]he likelihood that some state other than that where the injury occurred is the state of significant relationship is greater in those relatively rare situations where, with respect to the particular issue, the state of injury bears little relation to the occurrence and the parties").