131 Nev., Advance Opinion 50

# IN THE COURT OF APPEALS OF THE STATE OF NEVADA

TONI SANDERS; AND ROBERT
SANDERS, AS HUSBAND AND WIFE,
Appellants,
vs.
RISA SEARS-PAGE,
Respondent.

No. 62792

**FILED**

JUL 16 2015

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a jury verdict finding for defendant in a personal injury action arising from a vehicular accident. Eighth Judicial District Court, Clark County; Rob Bare, Judge.

*Reversed and remanded.*

Seegmiller & Associates and Clark Seegmiller and Robert L. English, Las Vegas,
for Appellants.

Atkin Winner & Sherrod and Thomas E. Winner and Andrew D. Smith, Las Vegas,
for Respondent.

_____

BEFORE GIBBONS, C.J., TAO and SILVER, JJ.

## OPINION

By the Court, SILVER, J.:

When a juror is biased against a party, that juror must be struck from the jury. In this appeal, we consider whether the district court erred in declining to strike an empaneled juror whose background

11/10/15: Corrected per letter to publishers. CT
7/16/15: Corrected per Order Modifying Opinion. CT

15-900780

experience implied bias but who asserted he could be impartial. We also consider the district court's decisions to invite challenges for cause with the juror present and to allow a newly discovered document to be entered into evidence and testified to on the final day of trial. We hold the district court erred in these respects and, accordingly, we reverse and remand for a new trial.

## FACTS AND PROCEDURE

This appeal arises from a jury trial on a personal injury claim for damages following a 2009 car accident. Respondent Risa Sears-Page made a right turn from a left-hand lane and hit appellant Toni Sanders' car. Initially, the accident appeared minor as neither party claimed injuries at the scene. A few days later, Sanders purportedly began experiencing neck pain that worsened over time. Sanders and her husband, appellant Robert Sanders, sued Sears-Page for negligence to recover damages, including medical expenses. Sears-Page admitted liability but denied causation and damages.

*Sanders' injuries*

The central issues at trial involved whether the accident had caused or contributed to Sanders' injury and, if so, whether Sanders' claimed medical expenses were reasonable. Sanders, who had chronic back pain, had previously experienced neck pain in 2004 from a bone spur. But she denied having neck pain in the years immediately preceding the accident, and two of her treating physicians testified the accident with Sears-Page caused Sanders' 2009 neck pain. Both doctors also testified Sanders' medical procedures and surgeries following the accident to alleviate pain were reasonably necessary.

To support her claimed damages, Sanders presented medical records and bills from Nevada Spine Clinic. Those records were generated

primarily by treatment from Doctors Jaswinder Grover, Babuk Ghuman, and Jorg Rosler, but many records were generated by other doctors and medical professionals at Nevada Spine Clinic. Of the people who treated Sanders at Nevada Spine Clinic, only Dr. Grover testified at trial. Dr. Grover was one of several doctors at that clinic who treated Sanders for chronic back pain before the 2009 accident and also treated her for neck pain after the accident, and testified all of Sanders' medical bills from Nevada Spine Clinic were reasonable.

Sears-Page denied Sanders' injuries occurred as a result of the automobile accident. Instead, Sears-Page asserted Sanders' symptoms arose from a preexisting degenerative medical condition. In opening statements, Sears-Page emphasized that Dr. Grover "sold [Sanders] spine surgery" and the doctors at Nevada Spine Clinic encouraged unnecessary surgery and medical procedures for their own financial gain. Sears-Page argued she should not have to pay for Sanders' unnecessary medical expenses, which were purposely inflated by Nevada Spine Clinic.

During trial, Sears-Page's retained medical experts, Dr. Joseph Schifini and Dr. Derek Duke, both testified Sanders' medical records showed a preexisting degenerative condition that developed over the course of several years, and her post-accident medical records were devoid of trauma to her neck. Both experts opined the accident did not cause Sanders' medical condition or contribute to her current neck pain. Dr. Duke further noted Sanders' medical history prior to the accident included treatment for neck pain in 2004 and 2009, which supported his opinion that Sanders' degenerative condition alone caused her current neck pain.

Both experts testified Sanders' surgery and medical procedures performed by Nevada Spine Clinic doctors were unnecessary and unreasonable. Further, they emphasized the clinic doctors' fees were significantly higher than average doctor's fees. Sears-Page argued Nevada Spine Clinic's physicians' practice of referring patients (like Sanders) to medical facilities owned by the physicians not only benefited the physicians financially, but also inflated Sanders' medical bills.

*Juror 9*

After opening statements and the testimony of Robert Sanders, Juror 9 notified the district court he previously had been a patient of Dr. Ghuman's at Nevada Spine Clinic. Because neither party mentioned Nevada Spine Clinic or Dr. Ghuman by name during voir dire, and the attorneys did not question Juror 9 regarding the names of his treating physicians for the back pain he disclosed during voir dire, Juror 9 was unaware of the connection until after opening statements.

Outside the presence of the other jurors, the district court and the attorneys questioned Juror 9. Juror 9 acknowledged several doctors at Nevada Spine Clinic treated him for a herniated disc. After an initial consultation with Dr. Ghuman, he was ultimately treated by other doctors at Nevada Spine Clinic who did not treat Sanders. When one of those doctors advised Juror 9 that back surgery was "inevitable" and encouraged him to schedule surgery, Juror 9 sought a second opinion from a doctor at a different facility regarding back surgery. Juror 9 followed the advice of the second doctor and opted for nonsurgical treatments.

Juror 9 stated he could be impartial "without a doubt," would "base [his] decision on facts," and would not "be inclined to give more credibility" to the conclusions of the doctors at Nevada Spine Clinic. When specifically questioned whether his experience might bias him *against* the

doctors at Nevada Spine Clinic, however, Juror 9 told the court, "I don't—I don't think so" and "I think I can keep an open mind." When Juror 9 was questioned regarding his ability to be impartial when viewing Nevada Spine Clinic's billing records, Juror 9 stated he had no problem with the billing from the clinic because he "didn't pay the bills anyway," referring to his insurance. Juror 9 advised the court he viewed "surgery as a last resort" and had "never been real enamored with having surgery." Additionally, Juror 9 stated he conducted "some research on fusion versus disc replacement" when deciding whether to have back surgery, and stated, "I kind of know which way I'm personally going to be leaning . . . [a]s far as my case." Neither the judge nor the attorneys asked Juror 9 about the nature or extent of his independent research.

With Juror 9 still present, the district court asked the parties if either wished to challenge Juror 9 for cause. Sears-Page stated she did not, but Sanders challenged Juror 9 for cause. The district court then asked Juror 9 to leave the courtroom, and Sanders argued for striking Juror 9. Although Sears-Page told the court the juror appeared to be impartial, Sears-Page also acknowledged there was an issue of bias. Additionally, Sears-Page characterized Sanders' arguments for striking Juror 9 as "good," and suggested the district court make Juror 9 an alternate instead of removing him for cause. The court denied Sanders' motion to strike Juror 9 for cause, stating Juror 9's answers demonstrated his ability to be impartial. Juror 9 later became the foreman of the jury.

*Exhibit 62*

Prior to trial, both parties sought medical records from Dr. Pollard, who was unaffiliated with Nevada Spine Clinic and treated Sanders between 2004 and the accident, but Dr. Pollard only provided incomplete medical records in response. Both sides demanded Dr. Pollard

produce additional records prior to the close of discovery, but he failed to comply with those requests. Neither party sought an order to show cause for contempt from the discovery commissioner regarding this issue. Instead, the parties proceeded to trial with the incomplete records.

During the week of trial, however, Sears-Page threatened Dr. Pollard with contempt if the complete records were not produced. Then, on the morning of the last day of trial, an unidentified person dropped off a box of documents at the courthouse to a member of Sears-Page's legal team. One of the documents was allegedly a portion of a medical record from a visit Sanders made to Dr. Pollard in 2005. That document stated Sanders suffered from "spinal degenerative joint disease and upper cervical area with bone spur." Yet, Sanders testified in her case-in-chief that she had not sought treatment for neck pain in 2005.

Sears-Page sought to introduce this document into evidence and proposed to the district court that Dr. Duke, one of Sears-Page's retained medical experts, authenticate the document. Sanders objected to the document's admission, but the district court admitted the document as exhibit 62 because the court felt this result was fair given Sears-Page's aggressive tactics to obtain the records during the trial proceedings.

Dr. Duke viewed exhibit 62 for the first time on the witness stand. He testified the document looked like a typical medical record. He then reviewed the document and opined that it supported his theory that Sanders had a chronic, degenerative disease that predated the 2009 automobile accident and was the sole cause of her neck pain.

The jury unanimously found for Sears-Page. Sanders appeals.

## ANALYSIS

The issues we consider on appeal are whether the district court erred in (1) failing to strike Juror 9 for cause, (2) inviting challenges

for cause while Juror 9 was present, (3) admitting exhibit 62, and (4) allowing Dr. Duke to give undisclosed opinions based on exhibit 62.[1] We agree that in all four instances the district court erred and its errors are reversible.[2]

*Sanders' challenge to Juror 9 for cause*

Sanders argues the district court erred in failing to remove Juror 9 for cause because Juror 9's statements suggested bias and he did not unequivocally state he could be impartial. We agree.

The Nevada Constitution, like the U.S. Constitution, guarantees litigants the right to a jury trial. Nev. Const. art. 1, § 3; *see* U.S. Const. amend. VII. "The right to trial by jury, if it is to mean anything, must mean the right to a fair and impartial jury." *McNally v. Walkowski*, 85 Nev. 696, 700, 462 P.2d 1016, 1018 (1969). "The importance of a truly impartial jury, whether the action is criminal or civil, is so basic to our notion of jurisprudence that its necessity has never really been questioned in this country." *Whitlock v. Salmon*, 104 Nev. 24, 27, 752 P.2d 210, 212 (1988). Under Nevada's Constitution, civil litigants are entitled to ~~12~~ impartial jurors who will fairly and honestly deliberate

---

[1]We do not address the remaining issues on appeal, including Sanders' arguments regarding attorney misconduct, the proposed jury instructions, and the eggshell plaintiff instruction. Insofar as the proposed jury instruction on apportionment of damages raises a purely legal question, we note the district court instructed the jury on aggravation of damages and appellants cite no Nevada law requiring the district court to also instruct the jury on apportionment of damages where there is only one alleged tortfeasor.

[2]Without commenting on the merits of Sanders' arguments, we caution the parties to be mindful of the potential grounds for attorney misconduct.

the case without interference from personal bias or prejudice.[3] *McNally*, 85 Nev. at 700-01, 462 P.2d at 1018-19.

Nevada law is well-settled that whether a juror must be stricken for cause is a question of fact to be determined by the trial judge. *Jitnan v. Oliver*, 127 Nev. ___, ___, 254 P.3d 623, 628 (2011); *see also* NRS 16.060 (providing that the district court tries all challenges to jurors for cause). Accordingly, we review a district court's denial of a challenge for cause to either a venireperson or a sworn juror for an abuse of discretion. *See Jitnan*, 127 Nev. at ___, 254 P.3d at 628-29; *Blake v. State*, 121 Nev. 779, 795-96, 121 P.3d 567, 578 (2005); *see also Nelson v. Commonwealth*, 589 S.E. 2d 23, 30-31 (Va. Ct. App. 2003) (applying the abuse of discretion standard to decisions regarding challenges for cause to both seated jurors and venirepersons).

If a juror's statements suggest actual bias, the trial court must properly question the juror to determine if the juror will be impartial despite the bias. *See Thompson v. Altheimer & Gray*, 248 F.3d 621, 627 (7th Cir. 2001) ("When a prospective juror manifests a prior belief that is both material and contestable . . . , it is the judge's duty to determine whether the juror is capable of suspending that belief for the duration of the trial." (emphasis omitted)). Actual bias arises where the juror's

---

[3]Although the right to an impartial jury has largely been addressed by our supreme court in a criminal context rather than in civil law, we note California's constitutional provision regarding the right to a jury trial is similar to ours, and California law has consistently extended the right of an impartial jury to civil litigants. *See Weathers v. Kaiser Found. Hosps.*, 485 P.2d 1132, 1140 (Cal. 1971); *Grobeson v. City of Los Angeles*, 118 Cal. Rptr. 3d 798, 809-10 (Ct. App. 2010); *Tapia v. Barker*, 206 Cal. Rptr. 803, 805 (Ct. App. 1984); *Clemens v. Regents of Univ. of Cal.*, 97 Cal. Rptr. 589, 591-92 (Ct. App. 1971).

statements evince a biased state of mind that will prevent the juror from acting impartially. *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997); *see State v. Squaires*, 2 Nev. 226, 230-31 (1866) (defining actual bias).

A juror's opinions or views for or against a party do not, without more, establish bias. *See Kaplan v. State*, 96 Nev. 798, 800, 618 P.2d 354, 355-56 (1980) (quoting *Irvin v. Dowd*, 366 U.S. 717 (1961)); *see also Thompson*, 248 F.3d at 625 (noting that a juror's stated tendency to believe prison guards over inmates, without more, is not a sign of bias). Rather, bias exists when the juror's views either prevent or substantially impair the juror's ability to apply the law and the instructions of the court in deciding the verdict. *See Preciado v. State*, 130 Nev. ___, ___, 318 P.3d 176, 178 (2014); *see also Thompson*, 248 F.3d at 625 (holding that a prior belief becomes "bias only if it were irrational or unshakable, so that the prospective juror would be unable to faithfully and impartially apply the law" (internal quotation marks and emphasis omitted)).

If the trial court *sufficiently* questions the juror and determines the juror can set aside any bias and be impartial, we will generally defer to the trial court's decision. *See Preciado*, 130 Nev. at ___, 318 P.3d at 178 (discussing the standard of review in challenges for cause); *Thompson*, 248 F.3d at 626-27 (finding the district court's failure to sufficiently question a juror after the juror revealed potential bias constituted reversible error); *see also United States v. Maloney*, 699 F.3d 1130, 1137-38 (9th Cir. 2012) (discussing several cases where the jurors in question had experiences similar to the facts of this case and the district courts' questioning of those jurors was sufficient to show their impartiality), *overruled on other grounds by United States v. Maloney*, 755 F.3d 1044 (2014).

Deference does not, however, mandate affirmance where failure to strike the juror was erroneous. *See Jitnan*, 127 Nev. at ___, 254 P.3d at 629 (holding the district court abused its discretion in failing to strike a juror for cause). The Nevada Supreme Court has clarified that the district court should err in favor of seating an impartial jury whenever doubts remain as to the juror's impartiality. *Bryant v. State*, 72 Nev. 330, 333, 305 P.2d 360, 361 (1956). Recently, the court reaffirmed that a "prospective juror who is anything less than unequivocal about his or her impartiality should be excused for cause." *Preciado*, 130 Nev. at ___, 318 P.3d at 177; *see Whitlock*, 104 Nev. at 27, 752 P.2d at 212 ("The importance of a truly impartial jury, whether the action is criminal or civil, is so basic to our notion of jurisprudence that its necessity has never really been questioned in this country."). Thus, if the juror's statements, taken as a whole, indicate bias, the juror must be struck. *See Jitnan*, 127 Nev. at ___, 254 P.3d at 629.

Our supreme court has never addressed a situation where a juror asserts impartiality despite having an experience so similar to the case being tried that the juror's impartiality is improbable. Other jurisdictions considering this question have determined that a juror's experience may directly impact the juror's ability to fairly judge the case, leading to bias. *See, e.g., Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 156 (3d Cir. 1995); *Dyer v. Calderon*, 151 F.3d 970, 975-76 (9th Cir. 1998). In such cases, reliance on the juror's promise of impartiality is insufficient when the record as a whole demonstrates lingering bias. *See Kirk*, 61 F.3d at 156; *Wolfe v. Brigano*, 232 F.3d 499, 502 (6th Cir. 2000).

In *Kirk*, the United States Court of Appeals for the Third Circuit held that a juror who had inhaled asbestos, knew people who were

suffering from asbestos poisoning, and feared succumbing to an asbestos-induced disease, should not have been empaneled in an asbestos damages case. 61 F.3d at 156. The court held the juror's background gave rise to an inference of impermissible bias in favor of the plaintiffs, and the juror would be more likely to return a large award of damages because of his own experiences. *Id.* Accordingly, the juror's statement of impartiality was insufficient to support the district court's denial of the challenge for cause. *Id.*

Likewise, in *Wolfe*, the Sixth Circuit determined a district court erred by accepting a juror's assertion of impartiality where the juror had a close relationship with the victim's family and had spoken to them about the crime. 232 F.3d at 502. The Second Circuit in *Torres* upheld a district court's finding of bias where a prospective juror in a criminal trial engaged in similar conduct as the conduct with which the defendant was criminally charged. 128 F.3d at 44-45. And in *Dyer*, ~~151 F.3d at 975-76,~~ the Ninth Circuit held a trial judge erred in accepting a juror could be impartial in a murder trial where the juror's brother died under circumstances similar to those suffered by the victims. 151 F.3d at 975-76.

We agree with these jurisdictions and hold that if a juror's "background is replete with circumstances which would call into question his ability to be fair," the district court should remove the juror for cause, even if the juror has stated he or she can be impartial. *Kirk*, 61 F.3d at 156. In determining whether to strike a juror for cause, the trial court should assess the actual facts of the juror's experience rather than rely solely upon the juror's assertion of impartiality.

In opening statements, Sears-Page told the jury "Nevada Spine Clinic sold Sanders surgery" and further suggested Sanders wanted

to make Sears-Page pay hundreds of thousands of dollars for this unnecessary surgery. After opening statements, Juror 9 admitted to the district court and parties he, too, was a patient at Nevada Spine Clinic. The district court questioned Juror 9 and elicited Juror 9's promise he would try to be impartial. The trial judge accepted those assurances as reliable.

It is well-established that trial judges are in the best position to view the prospective juror's demeanor and judge the veracity of the juror's assertion of impartiality, *see Jitnan*, 127 Nev. at ___, 254 P.3d at 628, 29, and therefore, in many cases, our inquiry would normally end here. Under the particular facts of this case, however, we conclude the district court nevertheless abused its discretion in failing to strike Juror 9 for cause. Despite Juror 9's assertion of impartiality, his experience was "replete with circumstances which would call into question his ability to be fair," *Kirk*, 61 F.3d at 156, and the record, read as a whole, suggests bias against the clinic's doctors and, by extension, Sanders' case.

Juror 9's recent experiences with Nevada Spine Clinic bore striking similarity to Sanders', with the critical difference being Juror 9 chose not to follow the clinic's advice. Juror 9 also expressly admitted he already determined "I kind of know which way I'm *personally going to be leaning*" under his own, and very similar, circumstances. Although Juror 9 stated he would not discredit the opinions of the clinic's doctors, his decision to discredit the clinic's advice in his own case creates a strong inference Juror 9 would be unable to set aside bias in judging the facts of Sanders' case. This inference is critical because the crux of this case turned on competing expert opinions. The credibility of Sanders' case rested almost entirely on the evidence provided by the clinic. Neither the

court nor the parties asked any probing questions about Juror 9's opinions regarding the doctors or the clinic. The court simply denied Sanders' challenge based on Juror 9's superficial statement that he would try to be impartial.

Moreover, Sears-Page's arguments during opening and closing statements emphasized the theory that the clinic's doctors "sold" Sanders unnecessary and overpriced surgery, along with other medical procedures. Because Juror 9 remained empaneled, Sears-Page benefited from making this argument to a juror who had been to the *same* clinic, seen one of the *same* doctors,[4] and been given the *same* advice to have surgery, but who instead researched alternatives to surgery and chose to disregard the clinic's opinion in favor of alternative, and inferably less expensive, nonsurgical treatments. In other words, this clinic *failed* to sell surgery to Juror 9. Juror 9's experience with this clinic significantly advantaged Sears-Page's ability to undermine the credibility of Sanders' experts and contest causation and damages.

Additionally, Juror 9's statements claiming impartiality were not wholly unequivocal, supporting the implication of bias. *Cf. Jitnan*, 127 Nev. at ___, 254 P.3d at 629 (detached language does not establish impartiality where the record otherwise indicates the juror could not unequivocally assure the court of his or her impartiality); *see also Preciado*, 130 Nev. at ___, 318 P.3d at 177 (holding that "a prospective

---

[4]Although neither Dr. Hoffman nor Dr. Khavkin treated Sanders or were involved in the trial, the defense focused on the records generated by multiple doctors at Nevada Spine Clinic in arguing that Sanders' requested damages were unreasonable and inflated, effectively putting the medical opinions and billing practices of Nevada Spine Clinic as a whole at issue.

juror who is anything less than unequivocal about his or her impartiality should be excused for cause"). Although Juror 9 did not state he doubted his ability to be impartial or he harbored bias, when directly questioned by the parties about whether his experience with the clinic would interfere with his ability to equally credit the evidence proffered by the clinic doctors, he qualified his statements regarding his ability to be impartial by responding, "I don't *think* so," and "I *think* I can keep an open mind." (Emphases added.) Further, Juror 9's statements that he did not have a problem with the clinic's billing practices because he did not have to pay the clinic's bills becomes particularly troublesome in light of defense counsel's continued arguments throughout trial that Sanders wanted Sears-Page to "pay for [her] surgery."

Despite these facts, the district court refused to strike Juror 9 for cause. This refusal is more disconcerting because the court later struck a juror who had dozed off for one to four minutes during the fifth day of trial. There, the juror was questioned separately and the juror assured the court she had been paying close attention and dozed for only a minute or two. Although neither party moved to strike that juror, the court sua sponte dismissed her. While we do not disparage the district court's determination to ensure the parties presented the case to an alert jury, we question why the court would remove a drowsy juror and not remove a juror whose background experiences unquestionably raised an inference of bias, to which both parties conceded. The court's sua sponte action of removing a drowsy juror while refusing to strike a juror whose background evinces bias is puzzling, particularly since there were sufficient alternates to replace both jurors.

Because a review of the record as a whole casts serious doubt on Juror 9's ability to be fair and impartial, we hold the district court abused its discretion by failing to strike Juror 9 for cause.

This error is reversible because Juror 9's presence on the jury resulted in an unfair empaneled jury. *See Jitnan*, 127 Nev. at ___, 254 P.3d at 630 (noting the party's constitutional right is violated when a seated juror is partial or unfair); *Aftercare of Clark Cnty. v. Justice Court of Las Vegas Twp.*, 120 Nev. 1, 5, 82 P.3d 931, 933 (2004) (explaining Nevada's right to a jury trial in civil cases). Under Nevada law, when a failure to remove a biased juror results in an unfair empaneled jury, the error is reversible. *See Jitnan*, 127 Nev. at ___, 254 P.3d at 630, 31 (holding that "a party's state constitutional rights [are not violated] unless he or she demonstrates actual prejudice; in other words, he or she must show that a member of the jury was unfair or partial"); *McNally*, 85 Nev. at 700, 462 P.2d at 1018. This is true even if the error is harmless, as the biased juror's presence on the jury violates the parties' right to an impartial jury under the Nevada Constitution. *See Preciado*, 130 Nev. at ___, 318 P.3d at 179 (a court's error in failing to strike a biased juror is harmless if the juror is not ultimately empaneled); *Aftercare of Clark Cnty.*, 120 Nev. at 5, 82 P.3d at 933 (recognizing the right to jury trial in civil cases under the Nevada Constitution); *McNally*, 85 Nev. at 700, 462 P.2d at 1018 ("The right to trial by jury, if it is to mean anything, must mean the right to a fair and impartial jury."); *see also Thompson*, 248 F.3d at 622 (holding the presence of a biased juror on a jury panel in a Title VII case warrants reversal regardless of whether the error was harmless).

Here, unlike *Jitnan* and *Preciado*, in which the Nevada Supreme Court held the district courts' failure to remove biased

venirepersons was harmless because they were not ultimately empaneled, 127 Nev. at ___, 254 P.3d at 630-31; 130 Nev. at ___, 318 P.3d at 179, the biased juror was empaneled, and Sanders had no ability to exercise a peremptory strike to remove him from the jury. Under these particular facts, this court cannot state with certainty that Juror 9's preconceptions did not infect the jury panel or affect the jury's verdict in addition to biasing the juror's views. *See Preciado*, 130 Nev. at ___, 318 P.3d at 179.

*A party's challenge for cause while an empaneled juror is present*

In conjunction with the district court's error in failing to strike Juror 9, we also consider the ramifications of the district court's conduct in asking the parties, in front of Juror 9, whether either wished to challenge Juror 9 for cause. On appeal, Sanders argues these actions constitute error. The parties did not object to the court's conduct at trial, and we generally do not review unpreserved issues on appeal. *See Old Aztec Mine, Inc. v. Brown*, 97 Nev. 49, 52, 623 P.2d 981, 983 (1981); *see also Oade v. State*, 114 Nev. 619, 621-22, 960 P.2d 336, 338 (1998). However, we may review unobjected-to judicial conduct to prevent plain error. *See Bradley v. Romeo*, 102 Nev. 103, 105, 716 P.2d 227, 228 (1986) (recognizing the appellate court's inherent ability to consider relevant issues to prevent plain error).

Our supreme court has recognized that a district court's conduct may influence jurors, prejudicing them against a party. *See Ginnis v. Mapes Hotel Corp.*, 86 Nev. 408, 417-18, 470 P.2d 135, 140 (1970) ("'[T]he words and utterances of a trial judge, sitting with a jury in attendance, is liable . . . to mold the opinion of the members of the jury to the extent that one or the other side of the controversy may be prejudiced or injured thereby.'" (quoting *Peterson v. Pittsburgh Silver Peak Gold Mining Co.*, 37

Nev. 117, 122, 140 P. 519, 521 (1914))); *see also Oade*, 114 Nev. at 624, 960 P.2d at 339 (noting that a judge's repeated statements regarding decorum to the defendant's lawyer may have prejudiced the jury against the admonished party). While jurisdictions differ regarding whether a district court abuses its discretion by refusing to conduct challenges for cause outside the presence of the prospective jurors during voir dire, *see People v. Flockhart*, 304 P.3d 227, 236 n.8 (Colo. 2013) (discussing this jurisdictional split), several have noted this refusal may amount to error if it results in the seating of a prejudiced juror.[5] The American Bar Association recommends trial courts entertain challenges for cause outside the juror's presence, in part so the juror is not prejudiced against the party making the challenge. *See ABA Standards for Criminal Justice: Discovery and Trial by Jury* 15-2.7(a) (3d ed. 1996).

After questioning Juror 9, and with Juror 9 still seated in the courtroom, the trial judge asked whether either party wished to challenge Juror 9 for cause. Sears-Page stated she had no challenge, but Sanders

---

[5]*See Flockhart*, 304 P.3d at 237 (noting that although a trial court retains discretion to determine whether to conduct challenges for cause in front of a juror, such action may be an abuse of discretion depending on the facts surrounding the challenge and the juror); *State v. Hardin*, 498 N.W.2d 677, 681-82 (Iowa 1993) (recognizing that if a juror becomes biased by hearing the challenge, the district court may have abused its discretion in requiring the parties to issue challenges in front of that juror); *Brooks v. Commonwealth*, 484 S.E.2d 127, 129-30 (Va. Ct. App. 1997) (holding that the trial judge committed reversible error under settled Virginia law by requiring a party to challenge a juror in front of the juror); *see also State v. Love*, 309 P.3d 1209, 1213 (Wash. Ct. App. 2013) (noting most parties would prefer to issue challenges outside the juror's presence to avoid possibly prejudicing the juror against the party), ~~petition for review granted, 340 P.3d 228 (Jan. 7, 2015)~~.

stated she wished to challenge Juror 9 for cause. The trial judge then asked Juror 9 to leave the courtroom.

Although Nevada law does not mandate judges entertain challenges for cause outside of the prospective juror's presence, a critical difference exists between the challenge of a prospective juror during voir dire and a challenge for cause in front of an empaneled juror, particularly where the challenge occurs immediately after the empaneled juror admits facts establishing an inference of bias against the party making the challenge, as occurred here. Had this exchange occurred during voir dire, the trial judge's conduct may not have prejudiced Sanders, as she would have had the ability to use a peremptory strike if she feared Juror 9 would be biased by the failed challenge.

Yet, "'[w]hat may be innocuous conduct in some circumstances may constitute prejudicial conduct in a trial setting,'" *Oade*, 114 Nev. at 621, 960 P.2d at 338 (quoting *Parodi v. Washoe Med. Ctr.*, 111 Nev. 365, 367, 892 P.2d 588, 589 (1995)), and we hold such was the case under these facts. The district court's actions here placed Sanders in the difficult position of arguing before a juror that he should be removed, and that juror knew Sanders did not want him on the jury. *See Brooks v. Commonwealth*, 484 S.E.2d 127, 130 (Va. Ct. App. 1997) (noting the "untenable position" parties are put in when considering challenging a juror for cause due to the potential to create bias, especially when the challenge is argued in front of the juror). Under these facts, the district court's process of requiring the parties to issue their challenges for cause in front of Juror 9 amounted to plain error. *See Gaxiola v. State*, 121 Nev. 638, 654, 119 P.3d 1225, 1236 (2005) (holding plain error arises where the error prejudicially impacts the verdict or seriously affects the judicial

proceedings' integrity or public reputation) (internal citations omitted); *see also Brooks*, 484 S.E.2d at 130 (finding error where the district court's actions likely led to a juror becoming biased against the party challenging the juror). Accordingly, this error is reversible.

*Exhibit 62*

We next consider whether the district court erred by admitting exhibit 62 into evidence and allowing Dr. Duke to testify to that document. We will not overturn a district court's decision regarding the admission of evidence absent a palpable abuse of discretion, as district courts have broad discretion in determining whether to admit evidence. *Sheehan & Sheehan v. Nelson Malley & Co.*, 121 Nev. 481, 492, 117 P.3d 219, 226 (2005). A district court abuses its discretion by admitting medical expert testimony that fails to comply with Nevada's rules governing the admission of evidence. *See FCH1, LLC v. Rodriguez*, 130 Nev. ___, ___, 335 P.3d 183, 190 (2014).

We conclude the district court abused its discretion in admitting exhibit 62 because it was not properly authenticated. We likewise conclude the district court further abused its discretion in allowing Dr. Duke to testify to an undisclosed opinion regarding exhibit 62. Finally, we conclude these errors were not harmless under these facts.

*Authentication*

Sanders argues exhibit 62 was improperly admitted because it was not authenticated. Sears-Page counters that exhibit 62 was properly admitted because both parties had attempted to obtain it prior to trial, two hearsay exemptions applied, and this court should defer to the district court's decision. We disagree.

Authentication is a basic prerequisite to the admission of evidence. *See* NRS 52.015. Under NRS 52.015(1), authentication of a document requires evidence or some other showing "that the matter in question is what its proponent claims." Authentication relates to relevancy because "evidence cannot have a tendency to make the existence of a disputed fact more or less likely if the evidence is not that which its proponent claims." *Rodriguez v. State*, 128 Nev. ___, ___, 273 P.3d 845, 848 (2012) (internal quotations omitted).

NRS 52.325 sets forth the procedure for authenticating medical records. This statute requires the custodian of the medical records to deliver a "true and exact" copy of the subpoenaed medical records to the clerk of the issuing court on or before the subpoena's deadline. NRS 52.325(1). The record "must be authenticated by an affidavit" in accordance with NRS 52.260(3), and signed by the custodian of the medical records, verifying the documents are accurate reproductions of the original medical records. NRS 52.325(2), (4). Additionally, the custodian must certify those original records were "made at or near the time of the act, event, condition, opinion or diagnosis by or from information transmitted by a person with knowledge in the course of a regularly conducted activity." NRS 52.325(2). Medical records delivered pursuant to a subpoena must "be kept in the custody of the clerk of the court issuing the subpoena, in a sealed container supplied by the custodian of the medical record." NRS 52.335(1).

In addition, NRS 52.025 through NRS 52.105 provide a nonexhaustive list of methods by which a document may be authenticated. NRS 52.015(2). As relevant here, NRS 52.025 permits a witness to

authenticate a document through testimony "if the witness has *personal knowledge* that a matter is what it is claimed to be." (Emphasis added.)

Where an expert authenticating a document has "[n]o . . . personal knowledge . . . as to how, when and in what manner" the document was made, the expert's testimony as to the document's authenticity, standing alone, is insufficient to authenticate the records. *Frias v. Valle*, 101 Nev. 219, 221-22, 698 P.2d 875, 877 (1985); *see also* NRS 52.025. In *Frias*, our supreme court considered an issue nearly identical to the one here. There, the district court allowed the admission of medical records after a doctor, who had treated the patient but who had not generated the records in question, testified the records belonged to the patient because they were labeled with the patient's name. *Frias*, 101 Nev. at 221-22, 698 P.2d at 877. The doctor viewed the records for the first time while waiting to take the witness stand, and he therefore had no personal knowledge regarding those records. *Id.* at 221, 698 P.2d at 877. The Nevada Supreme Court reversed, holding the records were not properly authenticated because the specialist had no personal knowledge of the records' authenticity: he neither ordered the records nor used them in treating the patient, and he did not even view them until immediately prior to giving testimony. *Id.*

Analogous to *Frias*, the document here, exhibit 62, merely contained Sanders' name on it. Dr. Duke did not author the document, was not the custodian of the record, and testified the document looked like a typical medical record. Dr. Duke, therefore, was not a proper witness who could authenticate the document under NRS 52.025 and NRS 52.015. Because no other evidence corroborated exhibit 62, since Sanders testified she had not sought medical care for neck pain in 2005, and the exhibit was

not properly authenticated, the district court abused its discretion in admitting exhibit 62.

The district court admitted exhibit 62, over Sanders' objection, despite Sears-Page's failure to comply with *any* of NRS 52.325's requirements. Sears-Page's counsel admitted he did not know the identity or representative capacity of the person who literally "dropped off" documents to his paralegal that morning. *See* NRS 52.325(1) (requiring the custodian of the records to deliver or mail the records). Here, the custodian of records did not deliver them to the clerk of the court as is required by NRS 52.325(1). *See* NRS 52.320(1) (defining "[c]ustodian of medical records"). And these medical records were not accompanied by a properly authenticated affidavit formatted according to NRS 52.260, signed by the custodian, or verified by the custodian to be "a true and complete reproduction of the original medical record." NRS 52.325(2). Nor was there any verification by the custodian that exhibit 62 was "made at or near the time of the . . . event" when it was purportedly recorded by Dr. Pollard or his staff during medical treatment of Sanders. *Id.* The fact that Sears-Page threatened to compel production of the medical records, and thereafter documents were dropped off during the trial, does not establish Dr. Pollard or his staff actually generated the documents or that the records were unaltered when the district court admitted exhibit 62 into evidence. As in *Frias*, the district court committed error by admitting exhibit 62, and the error was not harmless.

*Undisclosed expert opinion*

Sanders next argues the district court compounded its error by allowing Dr. Duke, the retained defense expert, to thereafter testify to an undisclosed opinion regarding exhibit 62. Sears-Page claims the district

court did not err by admitting Dr. Duke's testimony regarding exhibit 62, which is particularly disconcerting because Sears-Page filed a motion in limine prior to trial to prohibit Sanders' experts from testifying to any undisclosed opinion. The district court granted Sears-Page's motion preventing Sanders' experts from offering any undisclosed opinions. Yet, the district court allowed Sears-Page's expert to testify to an undisclosed opinion on the final day of trial and after Sanders rested her case-in-chief. We agree this is error.

Nevada Rule of Civil Procedure (NRCP) 16.1(a)(2) requires each party to provide a written disclosure of their experts *and* the contents of those experts' testimonies, including the information each expert considered in forming an opinion, well in advance of trial. Retained medical experts are subject to the requirements of this provision. *See FCH1*, 130 Nev. at ___, 335 P.3d at 189 (holding that where a treating physician's testimony exceeds the scope of opinions "formed during the course of treatment" (internal quotations marks omitted), the physician "testifies as an expert and is subject to the relevant requirements"). This rule serves to place all parties on an even playing field and to prevent trial by ambush or unfair surprise. *See id.* at ___, 335 P.3d at 190. The history behind the amendment of NRCP 16.1 reveals that one concern behind this rule was to prevent physicians from offering undisclosed opinions based upon evidence that had not been duly admitted or disclosed. *See In re Proposed Amendments to NRCP 16.1(a)(2)*, ADKT 472 (Exhibit A to Order Scheduling Public Hearing and Requesting Public Comment, November 9, 2011) (Memorandum from Discovery Commissioners Bonnie A. Bulla, Chris A. Beecroft, Jr., and Wesley M. Ayres); *id.* (Letter from J.R.

Crockett, January 25, 2012, and Letter from Martin Kravitz, April 13, 2012).

In *FCH1*, the Nevada Supreme Court held a district court erred by allowing the plaintiff's treating doctors to offer opinions based, in part, on documents not disclosed during discovery. 130 Nev. at ___, 335 P.3d at 190. One doctor read thousands of pages of records to form his opinion, yet disclosed only 21 pages during discovery, while other doctors' testimonies exceeded the bounds of their NRCP 16.1(a)(2)(B) disclosures and addressed topics not previously disclosed. *Id.* at ___, 335 P.3d at 189-90. Ultimately, the district court abused its discretion in admitting this testimony. *Id.* at ___, 335 P.3d at 190. Although the facts of *FCH1* are somewhat different than the facts here, the supreme court's rationale is particularly instructive in this case as the court was ultimately concerned with basic fairness, while disfavoring trial by ambush. *See id.*

Sanders testified in her case-in-chief that she had not experienced neck pain nor had she received treatment for neck pain after 2004 and prior to the accident. Dr. Duke, Sears-Page's retained medical expert, testified Sanders had a chronic condition causing her neck pain. Further, he opined Sanders' neck pain predated the accident, citing to a Nevada Spine Clinic intake form, which was created shortly before the accident, noting Sanders was experiencing neck pain during that time. After exhibit 62 was admitted into evidence, the district court allowed Dr. Duke to make additional opinions based on its contents supporting his previous opinion that Sanders experienced chronic neck pain for years prior to the accident and that the accident did not contribute to her pain.

The district court's decision allowing Dr. Duke to make an undisclosed opinion that exhibit 62 supported his position that Sanders

experienced chronic neck pain for years prior to the accident directly violated NRCP 16.1.

Although NRCP 16.1(a)(2)(B) allows the trial court to relieve a party of its duty to comply with the written report requirement for good cause, no facts support the district court's decision that good cause existed in this case. *Moseley v. Eighth Judicial Dist. Court*, 124 Nev. 654, 668 n.66, 188 P.3d 1136, 1146 n.66 (2008) (providing that "[g]ood cause generally is established when it is shown that the circumstances causing the failure to act are beyond the individual's control"). Here, Sears-Page had ample opportunity to obtain complete medical records from Dr. Pollard's office prior to trial and failed to do so. Rather, she proceeded to trial and defended with documents and testimony previously obtained and disclosed during discovery. Sears-Page's actions threatening Dr. Pollard with contempt and obtaining records during trial do not constitute good cause, as nothing prevented Sears-Page from taking such actions prior to the discovery deadline.

Moreover, although this is not a traditional trial-by-ambush situation because Sears-Page did not intentionally withhold information, the trial court's admission of exhibit 62 and allowing Dr. Duke to testify regarding its contents nevertheless unfairly surprised Sanders and damaged her case. *Cf. Sheehan & Sheehan*, 121 Nev. at 485, 492-93, 117 P.3d at 222, 226-27 (noting that though a party intentionally withheld information, it was not a trial-by-ambush situation because that information was later disclosed). The district court not only violated the

COURT OF APPEALS
OF
NEVADA

(O) 1947B

express requirements of Rule 16.1, but also its purpose and policy.[6] *See FCH1*, 130 Nev. at ___, 335 P.3d at 190 (noting the purpose of NRCP 16.1's document disclosure requirements). Accordingly, under these facts, the district court erred in allowing Dr. Duke to testify to an undisclosed expert opinion.

*Harmless error*

Sears-Page argues any error regarding exhibit 62 is harmless because Dr. Duke formed his opinion on other evidence previously disclosed to Sanders. We disagree.

Although we do not reverse a decision where error is harmless, "if the moving party shows that the error is prejudicial, reversal may be appropriate." *Wyeth v. Rowatt*, 126 Nev. 446, 465, 244 P.3d 765, 778 (2010). An error is prejudicial where the moving party shows "that the error affects the party's substantial rights so that, but for the alleged error, a different result might reasonably have been reached. The inquiry is fact-dependent and requires us to evaluate the error in light of the entire record." *Id.* (internal citations omitted).

The district court's errors in admitting exhibit 62, although the document was not properly authenticated, and in allowing Dr. Duke to testify as to an undisclosed opinion regarding that document, were not harmless in light of the record as a whole. Importantly, Dr. Duke's

---

[6]We further note that NRCP 16.1 parallels Federal Rule of Civil Procedure 26, which was enacted to prevent ambush at trial. *See Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutauo y Beneficiencia de Puerto Rico*, 248 F.3d 29, 35 (1st Cir. 2001); *see also Vanguard Piping Sys., Inc. v. Eighth Judicial Dist. Court*, 129 Nev. ___, ___, 309 P.3d 1017, 1020 (2013) (noting that "federal cases interpreting [analogous federal rules] are strong persuasive authority" (internal quotation marks omitted)).

pretrial disclosures focused on records noting Sanders' history of pain in her legs and back, yet Dr. Duke utilized exhibit 62 at trial to specifically recognize Sanders had an ongoing recorded history of chronic neck pain. And, exhibit 62 substantiated Dr. Duke's trial opinion of Sanders' ongoing history of neck pain, which significantly bolstered Sears-Page's defense while simultaneously impeaching the credibility of Sanders' testimony that she had not sought treatment for neck pain after 2004 and before the accident.

This created both unfair surprise to Sanders and prejudice to her case. Sanders was unaware of exhibit 62 or Dr. Duke's opinion as to that document until the final hours of the trial. And, as exhibit 62 and Dr. Duke's opinion regarding that document significantly helped Sears-Page's defense and damaged the credibility of Sanders' testimony regarding the onset of her pain, but for this document and Dr. Duke's undisclosed opinion, the jury may have reached a different result. The unfair surprise under these facts is further apparent considering the district court allowed Dr. Duke's undisclosed opinion despite granting Sears-Page's pretrial motion preventing Sanders' experts from presenting undisclosed opinions.

Because the district court allowed Dr. Duke, a retained defense expert, to testify to an undisclosed opinion after Sanders rested her case-in-chief, and because the district court previously granted Sears-Page's motion preventing Sanders' experts from presenting undisclosed opinions, the district court abused its discretion. And, because these errors resulted in prejudice to Sanders' case, the error was palpable and is reversible. *See Wyeth*, 126 Nev. at 465, 244 P.3d at 778 (holding such error is reversible where the result may have been different but for the error).

## CONCLUSION

The district court erred in failing to strike Juror 9 for cause as Juror 9's statements in their totality evinced bias against Sanders' case. This error resulted in an unfair empaneled jury, requiring reversal. The district court's process in allowing Juror 9 to be present while Sanders' challenged Juror 9 for cause likewise constitutes plain error under these facts. Further, the district court erred by admitting into evidence exhibit 62 over Sanders' objection as this document was not properly authenticated. Finally, the district court erred when it allowed a retained defense expert to testify to an undisclosed opinion by utilizing exhibit 62. Accordingly, we reverse and remand for a new trial.

_____, J.
Silver

We concur:

_____, C.J.
Gibbons

_____, J.
Tao